Okay, Mr. Cooley. Good morning, Your Honors, and may it please the Court, my name is Michael Cooley and I have reserved three minutes for rebuttal. Ms. Barrios had no trouble with the MS-13 gang until her husband, David Elias Rodriguez, failed to pay a gang tax that he had been targeted to pay. But that is not why Ms. Barrios faces what the immigration judge and noted gang expert Dr. Thomas Borman called a substantial risk of harm if she is returned to El Salvador. What sets this case apart is that after MS-13 kidnapped Mr. Rodriguez, he then escaped from their custody in what Dr. Borman called an audacious attempt to thwart the gang. This created what he called a perfect storm in that Mr. Rodriguez had egregiously offended and challenged the authority of MS-13. If they can find him, they will kill him. In his absence, Ms. Barrios is now a proxy for their rage. And those were Dr. Borman's words. But as he explained, Dr. Borman, excuse me, the gang's primary objective here is not money but to undermine legitimate actors to create a socio-political climate in which they themselves can act as a de facto government in the region. Nevertheless, by holding that MS-13's primary motivation here was a desire to expand its First, the board failed to properly examine the record to determine whether the finding upon which it based its decision at page 5 of the record was in fact supported under the substantial evidence standard. When matter of LEA, matter of LEA 1 we would say, asks whether the persecution is a means to an end, that end must necessarily be in the evidentiary record. Here there was no evidence that MS-13 wants anything from Ms. Barrios as opposed to from her husband beyond revenge for what Dr. Borman called the audacity of challenging them. This is, I would submit, Your Honors, the very definition of animus to the family. The second error by the board was that having adopted that finding, the board in two key sentences, again on page 5 of the record in their ruling, erroneously replaced the traditional both and analysis that has been established and maintained through matter of JBN and SM and matter of LEA and their progeny both at the board and as adopted in this circuit and replaced that established framework with an either or analysis in which the existence of one motive can negate another. And in doing so, the board applied notions of primacy and competitiveness as between the competing motives that has been expressly rejected by Congress and board precedent. For these reasons, we asked the court to grant the petition for review, reverse the board decision and remand for a proper examination of the record. Now turning to the first issue, the board found that the gang's motive was to use a on the speculation by the immigration judge that everything a gang does is simply a means to an end and that that end is, quote, the generation of illicit profits from page 119 of the record. But that's not what the expert said. What Dr. Borman said is that the gang's objective is to impose their power and undermine the operational capacity and authority of legitimate actors in furtherance of creating a sociopolitical climate in which they can act as a de facto government. And as Dr. Borman observed, anyone who interferes with or opposes the gang's efforts to establish political control is subjected to predictable acts of intimidation, terror and brutality. Now, is there a financial element to what MS-13 does? Sure. There is a financial element to almost everything that every organized group does. There was a financial element to the persecution of Jews by German Nazis in World War II because at the same time that they were persecuting Jews, sending them to camps and doing all the other things they did, they were taking their possessions, artwork, jewelry, other property. Does that mean that they were persecuted for a financial motive? Of course it doesn't. The mere fact of the existence of that financial element is irrelevant. But here, there's no other family relative that's being pursued, right? I mean, that's a very stark contrast from your Holocaust analogy. I appreciate the point, Judge Ho, and the answer to the question is, that is correct. The only individuals who were found to face a well-founded fear of persecution are Ms. Barrios and her children. However, that is also... There are other relatives in that family. There are other relatives in the area. And they were not pursued by the gang. That is correct. However, the record also shows that the only individuals in the area who were approached following Mr. Rodriguez's kidnapping and threatened with harm in the wake of his kidnapping were Ms. Barrios and her two minor children, who were specifically approached by the gang member Alfredo, is his name from the record. And so, I cannot say whether the persecution might extend to the extended family. However, the testimony, Your Honor, was that it would extend to the immediate family and that it was, in fact, the immediate family, according to the evidentiary record, who was targeted. And it is only those individuals with whom we are concerned in this particular appeal and with this particular argument. Coming back, I would note, Your Honor, that on this point of the incidental nature of the financial motive, the Board of Immigration Appeals itself took up this very issue and addressed it for us in matter of LEA when they held up the Bolshevik murder of the Romanov family, very much a specific family. As a classic example, the Board said, of a persecutor whose intent is for at least one central reason to overcome the protected characteristic of the immediate family. But it could just as easily be said that the Bolshevik revolution was motivated by runaway inflation or food shortages or other economic considerations. And so, was Anastasia and her family murdered for financial reasons? The Board said, no. Notwithstanding these other political and other motives, the Board said it would be difficult to say that family membership was not at least one central reason for their persecution. And that is the proper analysis here. And this goes to the very heart of the Board's error in this case because each of the other based on record evidence of some financial recruitment or other ultimate motive that existed independently from the familial relationship. In each of those cases, the petitioner stood between the gang and some prize. In matter of LEA, there was evidence of the gang's desire to gain access to the shopkeeper's storefront for drug sales. And the court held that the boy who was persecuted was a means to that end. And he would have been pursued, Judge Graves, to a point you made in the last proceeding, he would have been pursued whether he was the shopkeeper's son or just a kid from the neighborhood. It was his access to the storefront that was the end for which he was the means. In Ramirez Mejia from this circuit in 2015, there was evidence that the gang pursued a And the court held that she was a means to that end and would have been pursued whether she had a familial relationship to the person about whom the gang sought information or not. In Castro Rodriguez, a 2021 case, very recent from this circuit, Judge Ho, I believe you sat on that panel, there was evidence of persecution for a mother's refusal to surrender her son for gang recruitment. And there, this court held that the gang was motivated by a desire to increase its status by expanding its ranks, threatening the petitioner because she stood in the way of the gang's recruitment of her nephew was just a means to an end. In this case, there is no evidence that MS-13 wants anything from Ms. Barrios, nor that the substantial risk of egregious harm that she faces stems from their desire to enforce collection of whatever gang tax can be collected from a woman who used to make what money she did selling tamales on a street corner. According to Dr. Borman, what MS-13 wants in this case is to punish Ms. Barrios and her children for her husband's rebuke of their authority. And that, Your Honors, I submit, is animus to the family and what distinguishes this case in particular. I thought there was a letter here threatening her unless she paid him. That was earlier in... Am I wrong? Yeah. No, you are absolutely correct, Your Honor. There was a letter early on that threatening her if she did not pay money, what Dr. Borman described, and again, this goes back to a point that was made earlier regarding the Cruz case, is that even if the initial impetus for the engagement between the gang and the individual was based on something that would have been an unprotected ground like the gang threat, here that does not negate the possibility of relief or the possibility that some subsequent intervening motive could arise that would itself independently constitute... You're here about later events. I'm sorry? I'm sorry. You're here about later events. Yes. That's correct, Your Honor. And that is the distinguishing fact in this case, is his escape from the gang, which in and of itself constituted such an audacious rebuke. And just to be clear, from the record, the record evidence and the testimony and the well-founded fear of future persecution, and I would note for the Court that the escape took place after Ms. Barrios had come to the United States, and so that is why we believe that the record specifically shows in this case that that well-founded fear of future persecution, what the immigration judge called a substantial risk of harm with aggravating factors, is based on the escape and not the mere fact that they had at one point in time asked her for the money as well. The second error made by the immigration court, excuse me, by the Board, was to, as I said, to replace the traditional both-and nature of the nexus analysis with an either-or construct that contradicts both congressional intent and established case law. Since 2009, in the case Shake v. Holder, this circuit has joined its sister circuits to adopt the Board's interpretation of the modern one-central-reason test as laid out in matter of JBN and SM and matter of LEA. In matter of JBN and SM, the Board observed that the Real ID Act actually served to deliberately soften the nexus requirement from a central reason to at least one central reason, and there was concern that the use of the term central implied a degree of dominance of one reason over another reason that Congress did not intend. And the second was to reaffirm the principle that someone who is persecuted for more than one reason is still protected, is still eligible for protection, if they can show a nexus to a protected grant. And so rather than defining in terms of centrality or primacy, the Real ID Act and the Board defined the one-central-reason test in terms of the minimum threshold that must be cleared. That protected grant must play, in the Board's words, more than a minor role and not be merely incidental, which is to say minor or casual, or tangential, which is to say superficially relevant. In this case, however, the Board did something else. In those two sentences, in the opinion, on page five of the record, the Board held that the gang was motivated by wealth and criminal enterprise as opposed to harming respondents on account of family status. And by putting it this way, the Board placed the two alleged motives in competition with one another instead of evaluating the familial relationship in its own right. Having done so, the Board then disregarded the well-established precedent to conclude that the familial relationship was subordinate to the primary motivation of perpetuating the criminal enterprise. Nexus, Your Honors, is satisfied where a protected grant plays more than a minor role. Whether another grant is primary is not part of the analysis. Congress specifically sought to avoid that exact type of comparison, nor is it a test in which the agency is free to pick the most persuasive from a list of options. Rather, being presented with a protected grant, the agency's role is to determine whether that grant played more than a minor role in the persecution. Having failed to do so in this case, the Board committed reversible error. Frankly, Your Honors, to consider this a mere gang tax case would only highlight the fallacy of the Board's reasoning, because there is no profit in pursuing Ms. Borios into the future as Dr. Borman described, nor any evidence of profit to be gained by the gang from doing so. And we need look no further for proof of this than the mere impracticality of persecuting Ms. Borios and her family, which is exactly what Dr. Borman said they would do in his to sell tamales on a street corner. This is the very antithesis of the notion of profit. Your Honor, I have reserved three times for rebuttal, but for these reasons, we would ask the Court to reverse and remand to the Board with instructions. Thank you. Thank you, Mr. Cooley. Maybe, yes, you've saved some time for rebuttal. Ms. Pergolese? Good afternoon, Your Honors. Sarah Pergolese for the Respondent, and may it please the Court. I'd like to start by saying that the Petitioner has myopically quoted the Board's language here in saying that the Board has engaged in improper either-or analysis. If the Board had done that alone, it would have been legal error that this Court could reverse. However, in the next paragraph, the Board applied in, again, affirming the Immigration Judge's decision, which cited the one central reason standard and applied it. The Board agreed that the Immigration Judge did not clearly err in finding that any desire to harm the Respondents was entirely subordinate to the primary motivation of perpetuating the criminal enterprise. That is an application of the proper mixed-motive standard, and thus is not a reversible legal error. And again, the Petitioner, in citing the one central reason standard and overemphasizing the fact that the words are at least one central reason, he has, in doing so, he has failed to also recognize that the word central is playing an important role in that standard. And that is that the word central means that the agency is doing a weighing of motives when more than one motive exists to find whether or not each of the motives is central. And therefore, it necessitates that those motives are weighed against each other and, again, that they are motives. If the Court will indulge me, I'd like to address Cruz as well. The Fourth Circuit has an improper understanding of the mixed-motive framework because it rests entirely on causation. In Cruz, the Petitioner's family membership is a cause, in fact, as to why she came into the crosshairs of the gang. But as Judge Ho aptly pointed out, it is not the reason the gang was motivated to harm her. And Judge Graves also made that point about the friend. In Wise-Zacharias, the Supreme Court, in interpreting the phrase on account of, which, in turn, the Real ID clarified that that was at least one central reason standard, made clear that motive is critical, and that is the motive of the persecutor. Within that statement, there are sort of two important and related concepts, and that is the motive must be held by the persecutor, they must be motivated to act by a protected characteristic that the victim holds. Petitioner also makes hay in their reply brief that the gang itself had quasi-political goals to control the neighborhood, but again, as is evident in cases like Elias-Zacharias, that general motivation of the persecutor is not sufficient. They must be motivated by a characteristic that the victim themselves hold. And in this case, the evidence does not indicate that the gang was so motivated by the petitioner's family membership. The facts are limited, as we all know, and no one is disputing that, but what we have in this case is we have a petitioner whose partner was extorted and then kidnapped, and she in turn was extorted while he was kidnapped. She then flees El Salvador. Her partner escapes and flees to another part of El Salvador where he lives with his brother who is not pursued or threatened by that same gang. She testified that he ended up also leaving El Salvador because he had a problem with the gang, but she could not say that that was connected to his immediate family, her partner, his brother's actions in defiance of that gang. The petitioner herself then, in leaving El Salvador, has also defied the gang. According to Dr. Borman's testimony and statement. But her immediate family, her mother, her siblings who live on the same compound that she did, were also never targeted or harmed on account of her actions. And the evidence thus does not compel the contrary conclusion that family membership was more than a minor motivation of this gang in its actions towards the petitioner. If there are no further questions, I would just, I would like to reiterate that this court has an opportunity to clarify its law in this case in acknowledging that in light of, I mean, obviously in, excuse me, in keeping with Elias Zacharias, in keeping with this one, in clarifying the motive framework as being a sequential mixed motive test in which causation is necessary but not sufficient. And that this more than minor prong really does explain the analysis that both each motive must be central, that a protective motive must be central, but also that it must be central to the motivation of the actor that is the persecutor. I would also offer that this court has an opportunity to reject the Fourth Circuit's understanding of mixed motive law, which erroneously focuses only on causation. And in doing so, again, I see I still have plenty of time but you don't have questions, but I would like to offer a clear example of why that focus on causation alone is insufficient in the motive context. What is unclear about our law, because the government in the previous case said that this was, I think the term was well-trod territory, and that was my understanding of our precedent. I agree that... What's the gap that you're thinking we need to close? I just mean specifically about LEA and the clarification of how these standards exist sequentially and together. The court has clearly deferred to matter of JBN and SM, which is, again, the articulation of that final point in the mixed motive framework, but LEA has clarified that causation is also important and is a prerequisite, essentially. That standard before was explained in the board's decision of matter of NM, and what LEA 1 did, again, it didn't change the law, but it clarified, and clarifying that it is a sequential two-step analysis, essentially. I apologize if I'm missing the point. Are these cases that we're hearing today, are they, and I guess it's not fair for me to ask you about the previous case, but is this case a mixed motive case, or a pure criminal enterprise case, and not a family case at all? It sort of gets complicated, right, because in this case, the agency applied a mixed motive framework. They clearly referred to matter of JBN and SM, and that subordinate language that does indicate that there is a weighing against the motive. How do you analyze it? That's how I would defend it, but I also think that the basic motive requirement, as explained What's the family motive here? I guess that's what I'm trying to figure out. There's very little evidence of it. It seems, at least, that the immigration judge, though, accepted that it may be a motive, but found that it did not meet that more than minor prong, and sometimes that If you have problems, I think you did hear from the previous argument, the fact that motive of the persecutor. Exactly. I think this case is factually analogous, at least in that respect, so perhaps this is better viewed as a single motive case, and we can avoid the mixed motive doctrinal difficulties. The way we've defended this is because of, again, obviously under Chenery and principles of this is how the immigration judge decided it, and the board affirmed it in this case. Probably unfair, but do you know if that's different in the previous case? My understanding is that is more of a no motive, the family wasn't a motive at all, so basically what I was trying to say Different IJ analysis They're different. Basically, what we have been calling the basic motive requirement in Elias Zacharias is a two-part test in a way that sort of collapses with the more than minor. If you'll let me explain, it's from Elias Zacharias, it's that the persecutor knew of the protected characteristic, and that they cared and were motivated by it. And so that sounds a lot like the more than minor is also doing that, reemphasizing that the motivation of the persecutor is key, and so that second bit, were they motivated by it, they do sort of collapse in some ways, but You're concerned about the notion that we might decide both of the cases in the same way. I'm It's essentially the Chenery doctrine that we're not really allowed to do that in the second case. For my purposes, and I think it's also an opportunity for this court to maybe more forcefully reject the analysis of the fourth circuit that rests entirely on causation. And so again, if I could just give my quick example of what a causation standard essentially does, right? The example is a woman is a Christian, and she's going to services on Sunday, so she walks out of her house, and she witnesses a violent crime, and then the perpetrators of that violent crime tell her, hey, if you say anything, we're going to kill you. Now that woman was on the street at that exact time because of her religion, but we can't possibly say that the gang even knew or was motivated by her religion. So actually, Even though in a sense it's but for cause, but that's nothing to do with the motive. Exactly. It's within the causal chain, but almost what you were saying, Judge Ho, that wouldn't even meet the basic motive requirement, because there's no evidence that they knew of her protected characteristic. But let's say she was walking to church, and the crime happened right outside the church, so the violent criminals knew that she was on her way to church. Even if they said, hey, you, God is stupid, and if you tell anyone about this, we're going to kill you. Even still, it's very clear that even the gang's knowledge or acknowledgment of her religion was not something that motivated the threat that she received. And the only thing I raise now, and you may end up wishing you just ended right when you were done, because I've read what the IJ did as more of a, well, I'm not going to get into whether or not family qualifies as a particular social group, because there's this other reason that you don't prevail. That's kind of how I read that. And so, in your view, is that a settled issue? That a particular social group can just include a family? Family comes under the meaning of particular social group. Is that settled? It's not settled. Our position is that family can be a social group, and the recent Attorney General decision aggregating the former acting Attorney General's decision saying that most families are not a social group, LEA 3 is the most recent one, reverted the status quo back to LEA 1. And in LEA 1, again, as we're talking a lot, it's mostly a motive case, a nexus case, but the board also found that the petitioner in that case's immediate family was a social group, but in doing so found that it met the social group requirements, so it didn't say categorically that family is a social group. And that's usually a decision that is done case by case and on the record. And I share your opinion of the immigration judge's decision, again, that in this case that he didn't really—the immigration judge does do a second sort of alternative finding that the family isn't a social group in this case, but mostly does a nexus finding, but in so doing applies the mixed motive framework, JBN, and this court's own case law from—this which, again, is fully consistent with this motive framework. And now that I've talked way too much, I will thank you, Your Honors. Thank you, Mr. Pergolizzi. Mr. Cooley, you say time for rebuttal. Thank you, Your Honors. I want to start, if I may, with the hypothetical that Ms. Pergolizzi just laid out for the hypothetical, the fact that she left the house on the journey that caused her to be persecuted for religious reasons does not make that a religious persecution case because she was not persecuted on account of her religion, which simply means because of her religion, it was merely in the but-for chain, which, by the way, is exactly why the but-for concept is a very dangerous one. But-for causation is a specific level of causation. It is used in some contexts but not others, as this court recently observed in the Zamora case, which was a Title VII case. Here, what LEA actually said—they never used the words but-for. What they said is they asked whether the persecutor would have treated the individual the same if the protected ground did not exist. That's what they said. That's what they actually said. And I would submit that the hypothetical makes my point exactly. As for the JBN case, counsel suggested at the outset that we have to focus on the word central, and obviously the word central is in there, and there is much jurisprudence that has been written about it. But the font of the case law and the writings on this point begins with matter of JBN and SM. And in that case, which this court adopted in 2009, the board said that we have to be careful about that word because it implies a level of dominance of one motive over another that is not what Congress intended. And so, although it has to be at least one central reason, what the board has said is what that means is it has to be at least more than minor, not incidental, not tangential. Some circuits have suggested it could even be a secondary or tertiary role, as long as it is not superficially relevant to the case. In the hypothetical, her religion is only superficially relevant to the case. In this case, the original financial motive is at best only superficially relevant to the case. The reason that Ms. Barrios will be persecuted in the future by the MS gang is because after she left for the United States, her husband defied the gang in the most audacious way imaginable, as Dr. Borman described. I thank your honors for the privilege of being here today. Thank you, Mr. Cooley. Your case is under submission and we appreciate you.